**2010 BNH 027**         Note:   This is an unreported opinion.  Refer to LBR 1050-1 regarding citation.
_____

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| In re: | Bk. No. 05-12831-JMD |
| | Chapter 7 |
| Amherst Technologies, LLC, et al.,[1] | |
|         Debtors | Substantively Consolidated |
| | |
| Olga L. Bogdanov, Chapter 7 Trustee | |
| of Amherst Technologies, LLC, et al., | |
|         Plaintiff | |
| | |
| v. | Adv. No. 07-1094-JMD |
| | |
| Avnet, Inc., | |
|         Defendant | |

*Robert White, Esq. and Taruna Garg, Esq.*
*Murtha Cullina LLP*
*Boston, Massachusetts*
*Attorneys for Plaintiff*

*Annapoorni R. Sankaran, Esq. and Dennis A. Meloro, Esq.*
*Greenberg Traurig, LLP*
*Boston, Massachusetts*
*Attorneys for Defendant*

## MEMORANDUM OPINION

## I.  INTRODUCTION

Amherst Technologies, LLC and its related companies[2] (together, "Amherst" or the

"Debtor") and Avnet, Inc. ("Avnet") had been engaged in a business relationship for nearly ten

---

[1]  The related debtors are the following entities:  Amherst, LLC, Bk. No. 05-12833-JMD; Technology Consulting Services, Inc., Bk. No. 05-12834-JMD; Amherst Distribution Services, LLC, Bk. No. 05-12835-JMD; AmherstGOV, LLC, Bk. No. 05-12837-JMD; Amherst Computer Products SouthWest, LP, Bk. No. 05-12838-JMD; AmherstSE, LLC, Bk. No. 05-12839-JMD; Amherst LA, LLC, Bk. No. 05-12840-JMD; AmherstWest, LLC, Bk. No. 05-12841-JMD; ACP Sales, LLC, Bk. No. 05-12842-JMD; and ACP SalesSE, LLC, Bk. No. 05-12843-JMD.

[2]  The related debtors' cases were substantively consolidated by the Court on June 17, 2009.

years when the Debtor filed for bankruptcy in 2005.  Amherst was a value-added reseller who purchased electronic components and computer products from Avnet for its customers.  At the time the Debtor filed bankruptcy Avnet claimed it was owed a total of $5,349,896.78 in unpaid invoices and the balance due on a note.  In 2007, Olga Bogdanov, the chapter 7 trustee for the Debtor (the "Trustee"), filed this adversary proceeding against Avnet asserting claims for preferences and turnover.  In Count I, the Trustee specifically alleged that the Debtor made fifty-three preferential payments to Avnet within the meaning of 11 U.S.C. § 547(b) that are recoverable under 11 U.S.C. § 550 in the total amount of $4,372,645.14.[3]  In Count II, the Trustee asserted a claim for turnover in the amount of $97,762.68 pursuant to 11 U.S.C. § 542 on account of monies Avnet was paid by a customer who received goods purchased by Amherst.

Prior to trial, Avnet conceded that the Debtor made preferential transfers as alleged by the Trustee in Count I, and it conceded liability on Count II.  In March 2010, the Court conducted a two-day trial regarding the defenses asserted by Avnet to the Trustee's preference claims made in Count I, i.e., that (1) the Debtor's payments to Avnet were made in the ordinary course of business within the meaning of 11 U.S.C. § 547(c)(2);[4] and (2) Avnet extended new value to the Debtor within the meaning of 11 U.S.C. § 547(c)(4).

---

[3]  The fifty-three payments total $8,120,406.24.  The Trustee has conceded that a $1,077,866.00 payment made on or about July 1, 2005, constituted a prepayment and is not subject to avoidance.  At the time the complaint was filed, the Trustee had apparently further conceded that Avnet had valid defenses to $2,669,895.10 in payments made during the preference period.  At issue in this case is the validity of Avnet's other defenses to the Trustee's claims.

[4]  The parties agree that the Court must apply the terms of § 547(c)(2) in effect prior to October 17, 2005, the general effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), as the Debtor's bankruptcy case was filed on July 20, 2005.  BAPCPA amended § 547(c)(2) by changing the "and" between subsections (B) and (C) to an "or," thus making the prongs alternative and easier for preference defendants to establish when asserting an ordinary course defense.

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II.  FACTS

Amherst was a value-added reseller that provided information technology services to its customers.  Amherst enhanced existing hardware or software products by adding other components and resold integrated products to end-users.  Avnet is a global distributor of electronic components and computer products.  Amherst and Avnet had a business relationship that dated back to 1996.  Avnet was one of the Debtor's top three suppliers and was the Debtor's exclusive supplier for IBM products, a major portion of its business.  While Avnet supplied and shipped goods to Amherst and its customers on an unsecured basis, Amherst also had a floor financing arrangement with IBM Global Finance ("IBM").

In 2003 Avnet suggested that Amherst acquire the assets of Think Tank Systems LLC ("Think Tank"), another value-added reseller that did business with Avnet.  Amherst purchased Think Tank's assets and assumed some of the debt from Think Tank to Avnet.  On April 28, 2003, Amherst executed a note in favor of Avnet in the amount of $1.7 million.  Ex. 2.[5]  As a result of the Think Tank purchase, Amherst was able to expand its business from being a provider of low-end products and services to serving more lucrative middle-range and enterprise server markets.  As Amherst's volume of business grew so did its credit needs.  During the late 2004 time period, Avnet's credit limit for Amherst was $1.5 million with an additional $1

---

[5]  In May 2004, the parties executed an amended note in the amount of $1.7 million.  Ex. 5.

million "tolerance," which enabled Avnet to allow for temporary increases of Amherst's credit limit.

In December 2004, Amherst had a number of orders, including a very large order in the amount of $5 million, which would have placed Amherst well beyond its credit limit with Avnet. Amherst and Avnet discussed various options to allow Amherst's requested extension of credit in order to accommodate these orders, including the possibility of paying for the orders through Amherst's floor financing arrangement with IBM, payments of invoices to free up more credit, and other methods. After a number of discussions, Amherst agreed on December 21, 2004, that it would (1) pay Avnet $2.5 million in outstanding receivables, (2) pay Avnet an additional $2 million during the week of December 27, 2004, and (3) work back Avnet's accounts receivable to an increased credit limit of $4.5 million during the month of January 2005 (the "December Proposal"). Exs. 13-15.

In reliance on the December Proposal, Avnet agreed to extend credit on an unsecured basis to Amherst to accommodate the December orders raising Amherst's exposure to as high as $11.5 million, Ex. 15, and ending December 2004 with an exposure of $7,825,754.09, Ex. 301. This was the highest amount of unsecured credit that Avnet had ever extended to Amherst to accommodate business orders over the course of their relationship.

Amherst did not pay down Avnet's accounts receivable to $4.5 million by the end of January 2005. Ex. 18. As a result, over the course of February and March 2005, Avnet's credit managers attempted to find alternatives to bring Amherst back within the permitted credit limit,[6] agings and exposure. In order to accomplish this, representatives of Amherst and Avnet had a

---

[6] Amherst's official credit line, as of March 2005, was still $1.5 million with the "highest amount of credit [being] extended under normal circumstances [being] $4.5 million." Ex. 25.

4

number of communications by telephone and email about Amherst's outstanding accounts receivable and exposure over the credit limit, and a meeting to discuss the same was tentatively scheduled for March 9, 2005, and later rescheduled to March 24, 2005.

Before the meeting, Avnet decided that it could not support new orders if Amherst did not keep its accounts current. Ex. 35. As of March 16, 2005, Amherst was past due $3.5 million and it was over its credit line by $1 million. Ex. 40. Accordingly, in order to address Amherst's balance in excess of its credit limit and its past due balance, Avnet requested that Amherst bring its account current by the end of March 2005, by (1) using its IBM flooring line for new orders, or (2) paying Avnet $2 for every $1 of new product shipped going forward (the "2:1 Arrangement"). Ex. 43. On March 17, 2005, Amherst agreed to the 2:1 Arrangement. Ex. 44. Before then, the parties had never engaged in a 2:1 deal. Tr. (Day 1) at 36. Between March 17, 2005, and March 24, 2005, the 2:1 Arrangement was in place between Avnet and Amherst. Avnet applied Amherst's payments to older invoices and not to the new product being shipped out.

On March 24, 2005, representatives of Amherst and Avnet met to discuss Amherst's outstanding accounts receivable and exposure over the credit limit. The parties agreed on that date that Amherst would pay $1 for every $1 of new product it ordered from Avnet (the "1:1 Arrangement") with a minimum total payment from Amherst to Avnet by the end of March 2005 of $3 million. Exs. 49 and 50. Avnet and Amherst agreed to modify the 2:1 Arrangement to the 1:1 Arrangement because Amherst had the potential for a larger volume of business in March 2005 than it had expected when it agreed to the 2:1 Arrangement, and the 1:1 Arrangement would allow Avnet to support Amherst's business on an unsecured basis and also work to bring down Amherst's agings. Between March 24, 2005, and April 11, 2005, the 1:1 Arrangement

5

was in place with Avnet applying Amherst's payments to older invoices and not to the new product being shipped out.

As of April 11, 2005, the 2:1 Arrangement was back in place with Avnet supporting orders on that basis. Ex. 62. By April 20, 2005, the beginning of the preference period, Amherst's account had been placed on hold. Ex. 67. Orders had been flowing through without credit approval prior to that date as it had appeared that there was available credit on the account when in fact there was none. Id. At that time, Avnet reduced its tolerance amount to correct that issue, id., and, as of April 21, 2005, Avnet was "keep[ing] a close watch on them," Ex. 68. During the preference period, the parties discussed individual orders and payments on a frequent basis. Exs. 75-77. Orders were not being released without approval from Avnet's credit department. Exs. 78, 81, and 92. As of mid-May, the 1:1 Arrangement was back in place, and payments were being applied to the oldest invoices. Ex. 100.

Between April 20, 2005, and July 13, 2005, Amherst paid Avnet $8,120,406.24 on outstanding invoices dated from December 31, 2004, to July 1, 2005, and Avnet supplied and shipped goods to Amherst and/or its customers during this period, on an unsecured basis, in the amount of $7,019,112.33. Exs. 107 and 108. Amherst's payments during the preference period covered hundreds of invoices. From the period April 20, 2005, to June 24, 2005, Amherst wrote checks that paid nearly 300 invoices, all but nine were for invoices more than sixty days old.[7] Ex. 107. The Trustee's expert confirmed that from late April through late June Amherst paid Avnet $1.92 for every $1.00 shipped. Tr. (Day 2) at 100.

---

[7] In April 2005, Amherst proposed that it pay the past due balance of $1.5 million in three monthly installments of $500,000.00 so that Amherst would not have more than $1 million sixty days past due by the end of April, not more than $500,000.00 past due by the end of May, and be within sixty days by the end of June. Exs. 62 and 70.

In late June 2005, Amherst placed an order with Avnet for American Honda in the amount of approximately $4 million (the "Honda Order").  Based on Amherst's then current exposure and credit limit, Avnet's credit managers explored a number of options to finance the Honda Order, including a purchase money security interest, a prepayment, the use of the IBM flooring arrangement, or a split of proceeds between Avnet, Amherst, and IBM.  Exs. 83 and 86.  IBM would not permit Amherst to use flooring, to grant a purchase money security interest, or to split proceeds in order to finance the Honda Order.  Avnet ultimately agreed to support the Honda Order and made a request that it be on a partial prepayment basis.  Ex. 90.  At the time the request for prepayment was made, Amherst had already issued checks paying outstanding invoices in the system.  Specifically, on June 29 and 30, 2005, Amherst wrote eleven checks totaling $3.7 million, which paid approximately 165 invoices, all but twenty-two were for invoices less than sixty days old with many paying invoices less than two weeks old.  Ex. 107.  As a result, only $1,077,866.00 of the Honda Order was prepaid by Amherst.[8]  Ex. 90.  The rest of the order was accommodated by Avnet on an unsecured basis.  On July 13, 2005, Amherst wrote its last prepetition check to Avnet in the amount of $400,202.13; it covered the Honda Order invoice dated July 1, 2005.  Exs. 107 and 108.  Avnet concedes that it has no defense regarding $337,521.75 from that final transfer and therefore that amount is recoverable by the Trustee.

On July 20, 2005, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The case was converted on October 21, 2005, and the Trustee was appointed the chapter 7 trustee.  Avnet filed proofs of claim with the Court indicating it was owed a total of

---

[8]  The parties agree that this transfer constitutes a prepayment and is not subject to avoidance by the Trustee.

$5,349,896.78 as of the petition date, consisting of unpaid invoices in the amount of $3,751,896.78 and the unpaid balance on the note in the amount of $1,598,000.00 (POCs 93 and 196).  Avnet is the largest unsecured creditor in this case.


## III.  DISCUSSION

The preference section of the Bankruptcy Code specifically provides that a trustee may avoid any transfer of an interest of the debtor in property (1) to or for the benefit of a creditor, (2) for or on account of an antecedent debt owed by the debtor before such transfer was made, (3) made while the debtor was insolvent, (4) made on or within ninety days before the date of the filing of the petition, and (5) that enables such creditor to receive more than such creditor would receive if (A) the case were a case under chapter 7 of this title, (B) the transfer had not been made, and (C) such creditor received payment of such debt to the extent provided by the provisions of this title.  11 U.S.C. § 547(b).  The purpose of the Bankruptcy Code preference provision is the equality of distribution through the recovery of transfers made, voluntarily or involuntarily, on the eve of bankruptcy.  This policy is moderated, however, by various exceptions or defenses to otherwise valid preference claims, in order to encourage creditors to deal with financially distressed businesses.

The Bankruptcy Code sets forth specific exceptions to its preference provision for ordinary course transfers and the extension of new value.  The Code provides:

The trustee may not avoid under this section a transfer–

. . .

(2) to the extent that such transfer was–

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms;

. . . [or]

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor–

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

11 U.S.C. § 547(c)(2) and (4) (as in effect on the petition date).  These are the exceptions upon which Avnet relies in defending against the Trustee's claims in Count I.  Because the parties agree that the Debtor made preference payments within the meaning of § 547(b) to Avnet totaling $7,042,540.00 before defenses, the Court is faced only with the task of determining the validity of those defenses, which Avnet has the burden of proving.  11 U.S.C. § 547(g) ("[T]he creditor or party in interest against whom recovery or avoidance is sought has the burden of proving the nonavoidability of a transfer under subsection (c) of this section.").

**A.  Ordinary Course of Business under 11 U.S.C. § 547(c)(2)**

The ordinary course of business defense promotes leaving normal financial relations undisturbed in accordance with § 547's general policy of discouraging "unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy."  Brandt v. Repco Printers & Lithographics, Inc. (In re Healthco Int'l, Inc.), 132 F.3d 104, 109 (1st Cir. 1997) (quoting H.R. Rep. No. 595 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6329) (cited in Rifken v. Entec Distribution, LLC (In re Felt Mfg. Co., Inc.), 2009 BNH 026, at 12-13).  "[T]he exception is

intended to encourage creditors to continue short term credit dealings with troubled debtors in order to forestall bankruptcy rather than encourage it." <u>Gull Air, Inc. v. Embraer Aircraft Corp. (In re Gull Air, Inc.)</u>, 90 B.R. 10, 17 (Bankr. D. Mass. 1988). Because the pre-BAPCPA standard under § 547(c)(2) applies in this proceeding, Avnet must prove all three prongs under that section, i.e., (1) the payments were of debts incurred in the ordinary course of the business and financial affairs of the parties; <u>and</u> (2) the payments were in the ordinary course of dealing between the parties, i.e., the subjective test; <u>and</u> (3) the payments were in accordance with the ordinary terms in the industry, i.e., the objective test. Avnet must prove each element by a preponderance of the evidence. <u>Howard v. Bangor Hydro Elec. Co. (In re Bangor & Aroostook R.R. Co.)</u>, 324 B.R. 164, 168 (Bankr. D. Me. 2005).

### 1. Payments of Debt Incurred in the Ordinary Course

The parties do not seem to dispute that Amherst's payments to Avnet during the preference period were on account of debt that was incurred in the ordinary course of the parties' business relationship. 11 U.S.C. § 547(c)(2)(A). The record reveals nothing unusual about the transactions underlying the preferential payments. Rather, the debt was incurred in the normal course of operations. For that reason, the Court finds that Avnet has established the first element of its ordinary course of business defense.

### 2. Payments Made in the Ordinary Course of Business

Avnet must next prove that Amherst's payments were made in the ordinary course of the business or financial affairs between the parties. 11 U.S.C. § 547(c)(2)(B). This element of the ordinary course of business defense is subjective and focuses on the parties' relationship with each other. <u>Bangor & Aroostook</u>, 324 B. R. at 168. As such, the Court's inquiry is "peculiarly factual" and case-specific. <u>Id.</u> at 169; <u>First Software Corp. v. Curtis Mfg. Co., Inc. (In re First</u>

Software Corp.), 81 B.R. 211, 213 (Bankr. D. Mass. 1988).  "Under § 547(c)(2)(B), the question

is what was ordinary for these parties."  Bangor & Aroostook, 324 B.R. at 172 (emphasis in

original).

 A defendant must show that the debtor's transfers were made in the ordinary course of

both its business and the debtor's business.  Id. at 168.  The statute does not define the term

"ordinary course of business."  First Software Corp., 81 B.R. at 213.  Rather, courts frequently

look to an established "baseline of dealing" to compare transfers made during the preference

period with the parties' prior course of dealings.  Cassirer v. Herskowitz (In re Schick), 234 B.R.

337, 348 (Bankr. S.D.N.Y. 1999).  The factors that courts most commonly consider when

determining whether payments are ordinary include: (1) the length of time the parties were

engaged in the transactions at issue; (2) whether the amount or form of tender differed from past

practices; (3) whether the debtor or creditor engaged in any unusual collection or payment

activities; and (4) the circumstances under which the payments were made.  5 Lawrence P. King,

Collier on Bankruptcy ¶ 547.04[2][a][ii], at 547-54 (Alan N. Resnick & Henry J. Sommer eds.,

16th ed. 2010); see Bangor & Aroostook, 324 B.R. at 168.  The overall controlling consideration

is whether the transactions between the debtor and the creditor both before and during the

ninety-day preference period were consistent.  See Healthco Int'l, 132 F.3d at 110 ("the hallmark

of a payment in the ordinary course is consistency with prior practice").

 The record reveals that the parties' business relationship began in 1996.  Once Amherst

purchased Think Tank's assets in 2003 its business began to grow and it increasingly needed

additional credit with Avnet.  Before the end of 2004, Amherst's credit limit with Avnet was

$1.5 million with a $1 million of tolerance, but, by the end of the year, due to a large number of

orders, including a large transaction for $5 million, Avnet's exposure had increased to close to

$8 million.  Up until that time, Amherst had been generally been paying its invoices within sixty days.

Beginning in December 2004, Avnet began to closely follow all transactions with Amherst and to pressure and insist that Amherst lower its balances and shorten its aging.  In order to accomplish this Avnet instituted various payment options.  Avnet first implemented the 2:1 Arrangement on March 17, 2005, then switched to the 1:1 Arrangement on March 24, 2005, then back to the 2:1 Arrangement by April 11, 2005, and eventually back to the 1:1 Arrangement by mid-May.  Avnet conceded at trial that it had <u>never</u> used the 2:1 Arrangement previously during the parties' nine-year relationship.  Tr. (Day 1) at 36.  In addition, during April 2005, Amherst also agreed to pay Avnet the past due balance of $1.5 million in three monthly installments of $500,000.00 so that Amherst would not have more than $1 million sixty days past due by the end of April, not more than $500,000.00 past due by the end of May, and be within sixty days by the end of June.  Exs. 62 and 70.  The evidence demonstrates that Avnet was pressuring Amherst to make payments to reduce Avnet's exposure and was changing its terms month-to-month and week-to-week just prior to and during the preference period.  While the changing terms may have been in response to Amherst's credit needs, such activity is inconsistent with an "ordinary course" of dealing.  In fact, such conduct appears to be almost per se "not ordinary."

Avnet contends that (1) it supported the Debtor and filled all orders; (2) it used a variety of tools in its "tool chest" to support the Debtor; and (3) it had no idea that the Debtor was heading towards bankruptcy.  While all of this may be true, it is not enough to establish that Amherst's payments to Avnet during the preference period were made in the ordinary course of the business or financial affairs between the parties.  The record is clear that the dealings

between the parties changed just prior to and during the preference period due to the efforts by

Avnet's credit department to dig out from the exposure created in December 2004. The 2:1

Arrangement, the 1:1 Arrangement, and the prepayment of the Honda Order were "new deals"

between the parties, ones "which imposed terms and constraints not previously present between

the parties." J.P. Fyfe, Inc. of Florida v. BradCo Supply Corp., 96 B.R. 474, 478 (D.N.J. 1988),

aff'd 891 F.2d 66 (3d Cir. 1989). These arrangements caused the Debtor to make unusual

payments during the preference period. See Bangor & Aroostook, 324 B.R. at 171 n.11 ("[T]he

purpose of preference avoidance is not to discourage all collection activity. The aim is to

discourage unusual collection activity that inspires unusual payments within the preference

period and to recapture those payments for all creditors."). Whenever a bankruptcy court

receives evidence of unusual collection efforts, it must consider whether the debtor's payment

was in fact a response to those efforts. Marathon Oil Co. v. Flatau (In re Craig Oil Co.), 785

F.2d 1563, 1566 (11th Cir. 1986). Payments in response to a creditor's unusual debt collection

efforts fall outside the scope of the ordinary course defense. Ellenberg v. Plaid Enters., Inc. (In

re T.B. Home Sewing Enters., Inc.), 173 B.R. 790, 796 (Bankr. N.D. Ga. 1993).

     The email exchanges in the record reveal that discussions were occurring on a regular

basis during April, May, and June as to how much Amherst needed to pay before Avnet would

agree to ship particular orders. At times the account was placed on hold until additional

payments were made. Ex. 42. While Avnet contends that Amherst paid invoices in thirty to

ninety days, by May and June 2005, Amherst had reduced its aging to sixty days, and by the end

of June nearly all outstanding invoices had been paid. The record supports a finding that the new

payment arrangements between the parties caused Amherst's payments to Avnet to speed up

during the preference period.

The Honda Order at the end of June 2005 confirms for the Court that the parties were not operating in the ordinary course during the preference period. The record is clear that Avnet wanted the transaction to be prepaid. Amherst designated about $1.1 million as a prepayment and $2.9 million as payment of old invoices. Avnet accepted that allocation which resulted in payment of virtually all of Amherst's debt to Avnet at that time. Avnet's conduct indicates that regardless of its stated terms or rationale, so long as it was decreasing its exposure under the terms imposed from time to time, it would continue to ship.

While Avnet contends it never thought bankruptcy was imminent for Amherst, such consideration is irrelevant. The parties were not acting in the ordinary course. During the preference period, Avnet implemented extraordinary collection efforts to reduce significant receivables from the Debtor. As a result of these efforts Amherst cleared nearly <u>all</u> aged receivables by the end of June. The Court finds that Amherst's payments were not made in the ordinary course within the meaning of § 547(c)(2)(B). Accordingly, Avnet has failed to establish by a preponderance of the evidence an ordinary course defense under § 547(c)(2).

### 3.  Transfers Made in Accordance with the Ordinary Terms in the Industry

Because Avnet failed to prove the subjective element under § 547(c)(2)(B), the Court need not address whether Amherst's payments were made according to ordinary business terms within the industry under § 547(c)(2)(C). Having failed to establish an ordinary course of business defense to the Trustee's preference claim, Avnet must establish its new value defense in order to defeat the Trustee's claim in Count I.

### B.  New Value Defense under 11 U.S.C. § 547(c)(4)

Avnet contends that Amherst's transfers are protected by § 547(c)(4) because it provided new value to the Debtor by extending additional credit and shipments after the preference

14

payments were made.  In order to establish a new value defense, and offset a preference claim, Avnet must demonstrate by a preponderance of the evidence that: (1) it received a transfer that is otherwise avoidable as a preference under § 547(b); (2) after receiving the preferential transfer, it provided new value to the Debtor on an unsecured basis;[9] and (3) the Debtor did not compensate it with an otherwise unavoidable transfer for the new value.  Peltz v. Merisel Americas, Inc. (In re Bridge Info. Sys., Inc.), 383 B.R. 139, 152 (Bankr. E.D. Mo. 2008); see also Laker v. Vallette (In re Toyota of Jefferson, Inc.), 14 F.3d 1088, 1093 n.2 (5th Cir. 1994).  New value is defined in the Bankruptcy Code as "money or money's worth in goods, services, or new credit . . . that is neither void nor voidable by the debtor or the trustee under any applicable law."  11 U.S.C. § 547(a)(2).  Like the ordinary course defense, the new value exception encourages creditors to work with troubled companies and removes the unfairness of allowing the trustee to void all transfers made by the debtor to a creditor during the preference period without also giving corresponding credit to the preference defendant for its subsequent advances of new value to the debtor.  Felt Mfg., 2009 BNH 026, at 21.  "[T]he new value exception encourages creditors to continue to do business with financially troubled debtors, with an eye toward avoiding bankruptcy all together."  Mosier v. Ever-Fresh Food Co. (In re IRFM, Inc.), 52 F.3d 228, 232 (9th Cir. 1995).  "Courts examining a new value defense normally have to consider the timing of the payment, the timing for when new value was given, and how the new value is applied to preceding payments."  Felt Mfg., 2009 BNH 026, at 21.

The new value exception to a trustee's preference avoidance powers requires that new value be given by the creditor after the preferential transfer to the creditor.  Toyota of Jefferson, 14 F.3d at 1092.  Creditors may carry forward preferences until they are exhausted by

---

[9] It is conceded that Avnet did not hold security for the payment of the shipments in question.

subsequent advances of new value.  DeGiacomo v. Draper Knitting Co., Inc. (In re Jannel Indus., Inc.), 245 B.R. 757, 761 (Bankr. D. Mass. 2000) (citing IRFM, 52 F.3d at 232).  Accordingly, creditors may apply the giving of new value against the immediately preceding preference and against all prior preferences.  Crichton v. Wheeling Nat'l Bank (In re Meredith Manor, Inc.), 902 F.2d 257, 259 (4th Cir. 1990).  At issue in determining the applicability of the new value defense is whether each preferential payment has effectively been returned to the estate by an equal or even greater extension of new value by the creditor.  See Toyota of Jefferson, 14 F.3d at 1092.

### 1.  New Value within the Meaning of the Statute

The Trustee contends that Avnet did not provide Amherst with "new value" within the meaning of the statute.  According to the Trustee, Avnet's shipment of new product to Amherst was conditioned upon payment of a greater amount of old invoices, i.e., the 2:1 Arrangement, and thus no "new" credit was extended to the Debtor since the shipments did not replenish the estate which was being diminished by twice the value of the shipments.  In the Trustee's view, because the Debtor's overall obligation to Avnet remained essentially unchanged from the beginning of the preference period to the end of the preference period, Avnet did not provide any new credit to the Debtors.  Specifically, the Trustee contends that Avnet should not receive any new value credit for any of the shipments made in connection with the Honda Order as the Debtor was forced to pay down all amounts then existing so that the Honda Order could ship.

Avnet objects to the Trustee's attempt to impose a "material benefit" requirement to determine whether goods or services provided by a creditor constitute new value as the statute does not contain such a test.  Rather, Avnet contends that a creditor must simply provide actual value, i.e., "money's worth in goods, services, or new credit," to a debtor in order to avail itself of the new value defense under § 547(c)(4).  The statute describes "new value" as "money or

16

money's worth in goods, services, or new credit" and explains that it "does not include an obligation substituted for an existing obligation."  11 U.S.C. § 547(a)(2).  Avnet is correct that the Bankruptcy Code contains "no material benefit" test.  Rather, new value is money's worth in goods, services, or new credit.  The Court agrees that Avnet provided new value every time it shipped computer components and software to Amherst and/or its customers during the preference period, an amount that the parties agree totals $7,019,112.33.  Ex. 108.  Accordingly, Avnet has satisfied the requirement under § 547(c)(4) that it provided Amherst with new value.

### 2.  Must New Value Remain Unpaid?

The next issue raised by the parties is whether the new value must remain unpaid in order for the defense to be applicable.  The Trustee contends that it must remain unpaid while Avnet contends that it need not.  The Court agrees with Avnet that the plain language of the statute does not require new value to remain unpaid in order to qualify under § 547(c)(4).  Valley Candle Mfg. Co., Inc. v. Stonitsch (In re Isis Foods, Inc.), 39 B.R. 645, 653 (Bankr. W.D. Mo. 1984) ("We add that section 547(c)(4) does not contain any language that even suggests that the new value rule contained therein is somehow to be limited to unpaid invoices.").[10]  Rather, the proper inquiry is whether the new value has been paid for by "an otherwise unavoidable transfer."  IRFM, 52 F.3d at 231; see also Roberds, Inc. v. Broyhill Furniture (In re Roberds, Inc.), 315 B.R. 443, 472 (Bankr. S.D. Ohio 2004) ("The court adopts the legal interpretation of

---

[10]  While some circuits still require subsequent new value to remain unpaid, see New York City Shoes, Inc. v. Bentley Int'l, Inc. (In re New York City Shoes, Inc.), 880 F.2d 679 (3d Cir. 1989); Charisma Investment Co., N.V. v. Airport Sys., Inc. (In re Jet Florida Sys., Inc.), 841 F.2d 1082 (11th Cir. 1988); In re Prescott, 805 F.2d 719 (7th Cir. 1986), the majority do not, see Hall v. Chrysler Credit Corp. (In re JKJ Chevrolet, Inc.), 412 F.3d 545 (4th Cir. 2005); Jones Truck Lines, Inc. v. Central States (In re Jones Truck Lines, Inc.), 130 F.3d 323 (8th Cir. 1997); Mosier v. Ever-Fresh Food Co. (In re IRFM, Inc.), 52 F.3d 228 (9th Cir. 1995); Laker v. Vallette (In re Toyota of Jefferson, Inc.), 14 F.3d 1088 (5th Cir. 1994).

11 U.S.C. § 547(c)(4)(B) that 'paid' subsequent new value may be an affirmative defense to a preferential transfer if the subsequent new value is, stated without the double-negative, 'otherwise avoidable' by the debtor.  The court finds this approach follows the plain meaning of the statutory language and also meets the policy objective of Congress when the affirmative defense was enacted.").  Thus, the new value defense is not barred altogether anytime new value is repaid.  IRFM, 52 F.3d at 231.  Instead, the Court must determine whether the trustee can recover the repayment by some other means.  Id.  If a debtor subsequently repays the new value by means of "an otherwise unavoidable transfer," § 547(c)(4)(A) and (B) prevent the creditor from relying on the exception because no effective replenishment of the estate has occurred. Toyota of Jefferson, 14 F.3d at 1092.  In other words, subsequent shipments by a creditor, which enlarge the debtor's estate, are defenses to a trustee's preference recovery even if the debtor has later paid for those shipments, which reduces the debtor's estate, if the repayment of the subsequent new value would itself be avoidable and recoverable as a preference by the debtor but for the application of the new value defense.  "It is important to recognize, under the analysis this courts adopts, a creditor cannot receive a windfall or double benefit.  If subsequent value given by a creditor is paid with a subsequent advance from the debtor and this payment is subject to another affirmative defense (such as ordinary course of business, for example) which would make the payment 'otherwise unavoidable,' then the paid new value given cannot be used as an affirmative defense to any prior preferential transfer."  Roberds, 315 B.R. at 472-73.

### 3.  Transfers "Not Otherwise Unavoidable"

The Court must next determine whether the term "not otherwise unavoidable" in § 547(c)(4)(B) precludes Avnet from offsetting any transfers by Amherst that paid for previously extended new value with subsequent new value.  The Trustee contends that the term "not

18

otherwise unavoidable" means that a transfer that pays for new value that is used to offset a prior transfer cannot later be subject to any subsequent new value and requires a defendant to concede its avoidability for all purposes. Avnet argues that the only proper interpretation of "otherwise" as contained in § 547(c)(4) is that it applies to all theories of avoidability other than § 547(c)(4). In other words, paid new value may be counted as long as a creditor is prevented from asserting a separate § 547(c) defense against a preference when the creditor has already used § 547(c)(4) to offset the preference, i.e., subsequent new value can offset a transfer that pays a previously advanced new value. The Court agrees that § 547(c)(4) permits Avnet to offset transfers made by Amherst with subsequently extended new value, paid or unpaid, so long as any transfer that paid for such new value is not unavoidable but for § 547(c)(4). Given that conclusion, the new value defense will serve to significantly decrease Avnet's exposure on the Trustee's preference claim.

During the preference period Amherst made payments totaling $8,120,406.24 to Avnet, Ex. 107,[11] and Avnet shipped $7,019,112.33 in goods to Amherst and/or it customers, Ex. 108. At trial Avnet produced a detailed exhibit that sets forth the timing of payments made by Amherst and the timing and new value extended by Avnet in the form of shipped goods and/or credit during the preference period. Ex. 110. Avnet's new value analysis shows a preference exposure of only $337,521.75, not $4,372,645.14 as the Trustee contends in her complaint.

The Trustee challenges Avnet's analysis on the grounds that $2.2 million in payments made on June 30, 2005, were made as part of a contemporaneous exchange for new value in connection with the Honda Order and thus are not avoidable under § 547(c)(1). The Trustee contends that Avnet would not release the Honda Order without receipt of a $4 million payment,

---

[11] The $8,120,406.24 in payments includes the $1,077,866.00 prepayment for the Honda Order.

and, in fact, Avnet was expecting the entire $4 million would be treated as a prepayment instead of the $1,077,866.00 that ultimately was treated that way.  Avnet disputes the Trustee's contention and argues that transactions in which a creditor extends credit at the same time the debtor transfers payments for older receivables are specifically excluded from protection under § 547(c)(1).  Avnet cites <u>Gray v. Huntsman Chemical Corp. (In re Dooley Plastics Co., Inc.)</u>, 185 B.R. 389, 395 (Bankr. D. Mass. 1995), in support of its position.  In that case, the court concluded that a supplier had failed to establish that payments were intended to be a contemporaneous exchange for new value, given the evidence that payments were made in order to reduce the amount of the supplier's outstanding invoices and "payments toward such old invoices could hardly be said to be contemporaneous."  <u>Id.</u>

The evidence demonstrates that, despite Avnet's request that the entire Honda Order be financed on a prepayment basis, the Honda Order was not financed in that manner.  Rather, Amherst directed the first $700,000.00 payment be allocated to receivables other than the Honda Order and that the next $2.2 million be allocated to older receivables as well.  Tr. (Day 1) at 202-03.  "[T]ransactions that appear at first glance to be a contemporaneous exchange for new value will not be so considered under subsection 547(c)(1)(A) absent a showing that the parties actually intended the exchange to be contemporaneous."  <u>Collier on Bankruptcy</u> ¶ 547.04[1][a], at 547-47.  "[A] vendor who conditions continued deliveries to the buyer on the buyer's payment of old invoices will not be protected by section 547(c)(1) from attack by the buyer's trustee, even though the buyer's payment to the vendor and the vendor's transfer of property to the buyer occurred contemporaneously."  <u>Id.</u>  Under the facts of this case, Amherst intended the payments to cover prior transactions, not the Honda Order.  Accordingly, the $2.2 million in payments is

not protected by the contemporaneous exchange defense under § 547(c)(1) and therefore can be used as new value under § 547(c)(4).

As a result of the Court's conclusions, the Court has undertaken a review of Exhibit 110 to determine if it contains a correct new value analysis under the facts of the case.  The Court finds that it does.  Avnet properly removed the $1,077,866.00 prepayment which resulted in net payments totaling $7,042,540.24 being made to Avnet during the preference period while Avnet shipped goods worth $7,019,702.68 during this period.  Comparing the checks against the invoices, making sure that new value was given by Avnet after each preferential payment, and allowing Avnet to apply its new value against the immediately preceding preferential payment and against all prior preferential payments, the Court finds that Avnet's preference exposure is limited to transfers totaling $337,521.75.  Avnet has successfully established a new value defense under § 547(c)(4) as to the remaining payments.

**C.  Prejudgment Interest**

In her complaint the Trustee has asserted a claim for prejudgment interest.  "The Bankruptcy Code does not address the subject of prejudgment interest in preference . . . actions. . . .  Therefore, prejudgment interest is subject to the court's discretion, to be awarded or not according to the equities of the case."  Gray v. Travelers Ins. Co. (In re Neponset River Paper Co.), 219 B.R. 918, 919 (Bankr. D. Mass. 1998) (citations omitted), aff'd, 231 B.R. 829, 835-36 (B.A.P. 1st Cir. 1999); see also Lassman v. Keefe (In re Keefe), 401 B.R. 520, 526 (B.A.P. 1st Cir. 2009) .  "The purpose of prejudgment interest is not punitive but compensatory, and the court may award prejudgment interest to make the injured party 'whole.' . . .  Because these interest are 'paramount' in preference and fraudulent conveyance proceedings, 'courts have traditionally awarded prejudgment interest to a trustee who successfully avoids a preferential or

fraudulent transfer from the time demand is made or an adversary proceeding is instituted.'"
Keefe, 401 B.R. at 526 (citing Neponset River, 231 B.R. at 835).

Generally, prejudgment interest has been awarded where the amount of the claim was liquidated or reasonably ascertainable before judgment.  Robinson v. Watts Detective Agency, Inc., 685 F.2d 729, 741 (1st Cir. 1982).  However, even where the amount of the claim is not liquidated or reasonably ascertainable, prejudgment interest may be awarded in the discretion of the judge when requested by the plaintiff.  Bergquist v. Anderson-Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.), 850 F.2d 1275, 1281 (8th Cir. 1988); Robinson, 685 F.2d at 742; Felt Mfg., 2009 BNH 026, at 26; Neponset River, 219 B.R. at 920; In re Roco Corp., 37 B.R. 770, 774 (Bankr. D.R.I. 1984).

In this case, the equities favor the Trustee's claim for prejudgment interest.  While Avnet raised successful defenses to the Trustee's claims under Count I and early in the case conceded liability under Count II, the claims of the Trustee, and the impact of the defenses that were ultimately successful, were reasonably ascertainable by an examination of the records of payments and shipments.  The award of interest will help make the estate "whole."  Therefore, the Court will award interest at the rate prescribed in 28 U.S.C. § 1961(a) from the date on which the complaint was filed.  See Keefe, 401 B.R. at 526 n.7 ("[C]ourts generally award prejudgment interest at the federal rate prescribed in 28 U.S.C. § 1961(a) on preference recoveries arising under § 547 of the Bankruptcy Code.").

## IV.  CONCLUSION

For the reasons set forth above, the Court finds that Avnet did not establish an ordinary course of business defense under § 547(c)(2) to the Trustee's claims in Count I but did establish

a new value defense under § 547(c)(4), which limits the Trustee's recovery under §§ 547(b) and 550 to $337,521.75.  Avnet conceded liability in the amount of $97,762.68 on Count II.  This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  The Court will issue a separate order on the computation of prejudgment interest and a separate judgment consistent with this opinion.

ENTERED at Manchester, New Hampshire.


Date:   September 3, 2010                    /s/ J. Michael Deasy
                                             J. Michael Deasy
                                             Bankruptcy Judge